Filed 7/31/19; Certified for Publication 8/22/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| STOPTHEMILLENNIUMHOLLYWOOD .COM et al., | B282319 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BS144606) |
| v. | |
| CITY OF LOS ANGELES et al., | |
| Defendants and Appellants; | |
| MILLENNIUM HOLLYWOOD LLC, | |
| Real Party in Interest and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. James C. Chalfant, Judge. Affirmed.

The Silverstein Law Firm, Robert P. Silverstein for Plaintiffs and Appellants.

Kenneth Tom Fong, Office of the City Attorney for the Defendants and Appellants.

The Sohagi Law Group and Robert Tyson Sohagi for California State Association of Counties, as Amici Curiae on behalf of Defendants and Appellants.

Remy Thomas Manley, Whitman Fortescue Manley and Sara Fox Dudley for League of California Cities, as Amici Curiae on behalf of Defendants and Appellants.

Cox, Castle & Nicholson, Michael Zischke, Alexander M. DeGood and Andrew Sabey for Real Party in Interest and Appellant.

---

## INTRODUCTION

In this appeal, Millennium Hollywood LLC (Millennium), the City of Los Angeles and Los Angeles City Council (City) (collectively appellants) challenge the trial court's ruling that the proposed development of a four-and-a-half-acre parcel straddling Vine Street in Hollywood, California (the project) failed to comply with the requirements of the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et seq.)

Specifically, appellants challenge four aspects of that decision. First, they argue that the trial court's finding that the project description in the environmental impact report (EIR) failed to comply with CEQA's requirement for a stable and finite project description is incorrect as a matter of law. Appellants contend that this ruling conflicts with other cases allowing a flexible, general project description.

Second, appellants challenge the trial court's conclusion that the EIR's transportation impact analysis was fatally flawed because it failed to use the methodology directed by Caltrans, a responsible agency on this aspect of the EIR. Appellants assert that the City was within its sound discretion to use a

2

methodology that did not consider the traffic impacts of the project on the 101 Freeway, located blocks away from the proposed development.

Third, appellants challenge the trial court's finding that the traffic impact analysis was unsupported by substantial evidence because it failed to consider the cumulative effects of existing developments and growth in Hollywood, and the NBC/Universal development project, located three miles from the site on the other side of the 101 Freeway.

Finally, appellants argue that the trial court erroneously concluded that the qualified condition of approval (Q Condition No. 1) impermissibly expanded the scope of the project well beyond the scope of the EIR's analysis. (See Los Angeles Mun. Code (LAMC), § 12.32, subd. (G)(2).) Appellants argue that the various land use approvals "unambiguously" limit any project uses to those that are entirely consistent with the EIR.[1]

---

[1] Two organizations submitted amicus curiae briefs in support of appellants: League of California Cities (League of Cities) and the California State Association of Counties (State Association of Counties). The State Association of Counties' brief is directed to that portion of the trial court's decision regarding Caltrans's role in the environmental review of the project. As we do not reach those issues, we similarly will not reach the argument furthered by the State Association of Counties.

As for the League of Cities, its arguments largely repeat appellants' contentions that the project description satisfies CEQA's requirements and thus we do not separately address them. We deny the League of Cities' request for judicial notice. The materials sought to be noticed are not relevant to the legal determination of whether the project description utilized in this

Stopthemillenniumhollywood.com, Communities United for Reasonable Development, and George Abrahams (collectively Stopthemillennium) cross-appeal from that portion of the trial court's decision regarding the draft EIR's disclosure of seismic impacts of the development. Specifically, the trial judge found that the draft EIR adequately disclosed and analyzed the then-known facts regarding faults and their proximity to the Millennium development site. Stopthemillennium appeals that ruling, arguing that the trial court erred in finding that the draft EIR performed its required legal obligation to inform the public about seismic conditions at the development site.

We find that the trial court did not err in concluding that the project description used by the City and Millennium failed to comply with CEQA's requirement of an accurate, stable and finite project description. Thus, on this ground, we affirm. As the project description is at the heart of the EIR process in this case, it is not necessary to reach appellants' and Stopthemillennium's other contentions.

## BACKGROUND FACTS

The facts in this section are limited to the single basis upon which this decision rests—the legal sufficiency of the description of the project used in the EIR.[2]

---

case was sufficiently accurate, stable and finite to meet CEQA's requirements.

[2] The City adopted the project description contained in the draft EIR as the project description in the final EIR. Although at oral argument an issue was raised as to whether the possibility of the venue being used for outdoor concerts was added by a city council person before final approval, the late inclusion of that use was not challenged below. Appellants conceded at oral argument

4

The location of the proposed development at issue is a 4.47-acre site straddling Vine Street, south of Yucca Street, and north of Hollywood Boulevard.  The site surrounds the historic Capitol Records Building in Hollywood.

A.      The 2008 Proposal

On August 18, 2008, Millennium filed a master land use permit application with the City's planning department.  The 2008 project was described as a mixed-use development, consisting of approximately 492 residential units, a 200-unit luxury hotel, 100,000 square feet of office space, a 35,000-square-foot sports club and spa, more than 11,000 square feet of commercial uses, and 34,000 square feet of food and beverage uses.  The historic Capital Records Tower and Gogerty Building would be preserved and maintained as an office and music recording facility.

As an attachment to the application, Millennium described what it proposed to build and the purposes for which the buildings would be used.  The 2008 project was to have three separate towers arising out of two low-rise buildings situated on the east and west sides of Vine Street.  The new construction would "frame" the Capitol Records Tower, incorporating extensive and inviting open spaces and terraces located on the multi-tiered low rise buildings.  In addition, Millennium proposed a high-rise observation deck at the top of the tallest tower in the 2008 project.  In that application, Millennium requested a zone change to permit a sports club, and a variance to allow greater development density than was allowed under existing plans.

that the project description used in the draft EIR is the same project description that was used for the final EIR.

5

The 2008 project application specifically described what Millennium proposed to build. On the lot situated east of Vine (East Site), the new construction was to consist of a 12-story low-rise building, partially wrapped around seven stories of above-grade parking, on top of five stories of subterranean parking. The East Site buildings would integrate two ground floors and a 33-story residential tower that would rise out of the low-rise building to approximately 554 feet above street level, "creating a 45-story, 578,574 square foot structure that [would] be 584 feet above ground" at the highest point of the building.

On the lot situated west of Vine (West Site), Millennium proposed to build a four-story, two-tiered low-rise structure, comprised of a sports club with a spa as well as a hotel lobby. That low-rise structure would support two towers with four subterranean levels of parking, creating a 470,201 square-foot building. The two ground floors would be integrated at the mezzanine level. The larger tower, offset at an angle, would be approximately 482 feet above street level at the roof of the highest habitable floor, or 511 feet at the top of the roof-top parapet. The larger tower would have 34 stories of residential uses. The smaller second tower, also situated at an offset angle and located at the corner of Yucca and Ivar Streets, would be a 200-room luxury hotel, creating a 14-story structure that would be 218 feet above street level at the top of the roof. The residential tower would include 175 condominium units. In total, the completed project would be 1,163,079 square feet of floor area.

Detail was not omitted from the 2008 application. Millennium described the pedestrian plazas with "post card views" of the Capitol Tower, outdoor dining areas, lounge seating,

6

a sun deck and a pool for the hotel.  The entryway on Argyle Avenue "would be accented by an additional water feature and decorative ornamental planting."  Detailed site plans, locations, and elevations for the buildings, architectural renderings of the buildings themselves, and the related features of the development were included.

Thereafter, the City Department of Building and Safety informed the developer that the proposed project's enclosed balconies would exceed the 6:1 floor area ratio (FAR) allowable under the City's general plan and would, therefore, require a variance.  Millennium took no further action on the project until 2011.

B.    The 2011 Proposal

Millennium submitted another master land use permit application to the City's planning department in April 2011.  The 2011 proposal shared similarities with the 2008 proposal.  The total project size was largely the same, and the proposed mixed-use nature of the development was preserved.  Parking garages were described as both subterranean and above-grade.  Proposed uses for the buildings were described (such as residential uses, hotel and commercial uses), but this application noted that "[t]he Project may alter the types or amounts of the uses from those listed above in compliance with the Land Use Equivalency Program and Development Standards."  Missing from this application was any description or detail regarding what Millennium intended to build.[3]

---

[3]    And, as noted in the final EIR, any approved project under this application and CEQA process would have to comply with what was studied in the draft EIR, not what the 2008 application describes.

This lack of detail about the proposed project and what it would look like and for what uses it would be built continued throughout the environmental review process. As described by Millennium's lawyer, "the [2011 project] is presented as a concept plan and several land use scenarios." The concept plan identified various components, including residential units, hotel, office, commercial, food and beverage, fitness center, and parking uses. The project description "is designed to create an impact 'envelope' within which a range of development scenarios can occur."

In its initial study, the City described the project to include the construction of 1,052,667 square feet of newly built floor area. The Capitol Records Tower and the Gogerty Building, which are within the project site, would be preserved and maintained as office and music recording facilities. The maximum floor area (existing buildings plus new construction) would total 1,166,970 square feet, with a 6:1 FAR averaged across the project.

Although not specifically identified, quantified or located within the building sites, "[t]he [p]roject would develop a mix of land uses, including residential dwelling units, luxury hotel rooms, office and associated uses, restaurant space, health and fitness club uses and retail establishments."

And, a development agreement for the project would have a 25-year term and embody the project's pre-defined limits "regarding developable floor area, permitted land uses, design guidelines, and site-specific development standards," which would "control the scale and massing of the Project." The initial study did not include any drawings or renderings of what Millennium proposed to build, the number of buildings, their shape and size, their location within the building sites, or the purposes to which they would be put. The only stable and finite

description of buildings at the site was the size, location, and purposes of the existing Capitol Records Tower and Gogerty Building.

The initial study incorporated a land use equivalency program (LUEP) as part of the project description. Under the LUEP, Millennium could transfer floor area among parcels within the project. These adjustments "could result in several potential development scenarios." These potential scenarios and combination of land uses "would occur within the development thresholds contemplated in the Development Agreement including the not-to-exceed FAR." Thus, the initial study failed to describe a stable or finite commitment regarding the uses to be made of the undisclosed and undescribed constructed buildings.

C.     The Draft EIR

The City described the project in the draft EIR. In section II of the appendices of the "Millennium Hollywood Project Development Regulations: Guidelines and Standards," the project is described as a "mixed use development" that spans the north half of two blocks on either side of Vine Street between Hollywood Boulevard and Yucca Streets.

As for specifics, however, the draft EIR contained very few. Instead, "[t]he Project would implement a Development Agreement . . . that would vest the Project's entitlements, established detailed *and flexible* development parameters for the Project Site and ensure that the Project is completed consistent with [these parameters]." (Italics added.) "Implementation of a proposed Development Agreement also would grant flexibility regarding the final arrangement and density of specific land uses, siting, and massing characteristics subject to detailed development controls." Development regulations would be

9

adopted in conjunction with the proposed development agreement which would prevail over any inconsistent land use regulations in the LAMC.[4]

As expressly noted in the draft EIR, because "flexibility is contemplated in the Development Agreement with regard to particular land uses, siting, and massing characteristics, a conceptual plan has been prepared as an *illustrative scenario* to demonstrate *a potential development program* that implements the Development Agreement land use and development

_____

[4] The project site was zoned C4-2D-SN, which is commercial with limitations and multi-family residential uses within Height District 2. Millennium requested uses permitted in the land use equivalency program *or* as permitted in the C2 zone, as defined in section 12.16.A of the LAMC in Q Condition No. 1. Although Millennium asserts that Q Condition No. 1 was added solely to allow it to include a health and fitness center in the project, the plain language of the condition does not include such limitation. Q Condition No. 1 reads, in full: "The use of the subject property shall be limited to those uses permitted in the Land Use Equivalency Program, attached as Exhibit D *or* as permitted in the C2 Zone as defined in Section 12.16.A of the L.A.M.C." (Italics added.) While it may be that future developers elect not to construe this provision by its literal terms, it is the plain meaning that governs the interpretation. At oral argument, Millennium argued that the remaining conditions (such as Q Condition No. 2, which incorporates the development regulations) made it obvious that the language in Q Condition No. 1 was only to allow a fitness center to be incorporated in the project. A review of the development regulations, however, fails to support that argument. Nothing in these regulations mandates the construction of a fitness center. In fact, the development regulations state that "[t]he Project Site is zoned Commercial (C2)."

standards (the Concept Plan)." (Italics added.) Thus, this concept plan was simply one "scenario" that might result from the approval of the development agreement. Two other possible scenarios were also identified in the draft EIR: the residential scenario and commercial scenario. All three scenarios were included in the draft EIR as "representative development scenarios, in order to help establish the maximum environmental impacts" to be studied under CEQA. The draft EIR explained as follows:

"Through the analysis of the Concept Plan and two additional scenarios, the Commercial Scenario and the Residential Scenario . . . this Draft EIR analyzes the greatest possible impact on each environmental issue area. The most intense impacts from each scenario represent the greatest environmental impacts permitted for any development scenario for the Project. The Project may not exceed any of the maximum impacts identified for each issue area from either the Concept Plan, the Residential Scenario, or the Commercial Scenario."

The scenarios presented in the draft EIR, therefore, are only *possible* development schemes, any of which could implement the development agreement and land use and development standards. The concept plan "provides an illustrative assemblage of land uses and developed floor area that conforms to the terms of the Development Agreement." A potential configuration of the various buildings, and their location on the two lots, are provided. And "proposed net developed floor area" shared by the potential uses is enumerated.

The residential scenario increased the number of dwelling units, eliminated the hotel, did not increase office space beyond that already provided by the Capitol Records Tower and Gogerty

11

Building, and provided retail, restaurant and a sports and fitness club. The commercial scenario proposed a development that increased office space and hotel space at the expense of dwelling units.

As for scale and massing of the proposed development, the development regulations established height zones (A, B, C and D) and maximum floor plates for the towers. Within these zones, a building or buildings to a maximum height could be constructed. In addition, "the Project will occur within a pre-determined massing envelope." Maximum tower lot coverage, minimum floor area below certain heights, maximum floor tower plates, minimum setbacks and minimum public open space were set out. Certain rules for towers were provided. Grade level standards were also imposed to regulate street wall massing, entrances, and store fronts.

Using these parameters, "conceptual architectural renderings" of a potential project were provided. The draft EIR expressly noted, however, that "these conceptual scale and massing renderings are not building designs and are being presented for purposes of depicting *potential* massing options that could be developed under the Development Regulations and Equivalency Program; other massing options are possible, but would not be more impactful than the option analyzed herein." (Italics added.)

Thus, other than being assured that ten viewpoints would be preserved, the public had no idea how many buildings or towers would be built and where they would be located on the project site. Instead, the public had only conceptual drawings of a development that might not be built.

D.     Final EIR; City Council Approval

The final EIR was published in February 2013.  It included, without modification, the project description set forth in the draft EIR.[5]  The final EIR included criticisms received after issuance of the draft EIR from members of the public—many of whom complained that the draft EIR's project description made it impossible for them to participate meaningfully in the CEQA process.  One commenter complained that the draft EIR lacked an accurate, stable, and consistent project description:  "The [draft] EIR's equivalency program would allow virtually any type of development to be built, irrespective of what the [draft] EIR renderings and vague development regulations might indicate." Without greater specificity about the project, the public would be unable to "meaningfully participate in the approval process for the Project."  This commenter complained that based on the draft EIR, the public had no idea "what types of uses will ultimately be built, where on the site they will be, what their general design will be, and what the ultimate environmental impacts will be." Notably, the draft EIR failed to disclose and analyze basic things—like "project driveways and ingress and egress from the Project's . . . Vine Street driveways (assuming there will be Vine driveways)"—making it impossible to assess the project's impact on traffic circulation in one of Hollywood's "most congested areas."  In short, this commenter observed, "we have no idea what will be built, except that it will likely be massive."  The

---

[5]     Once a draft EIR is prepared, the public is provided notice and an opportunity to comment.  (Pub. Resources Code, § 21092.) These comments and responses, if any, are subsequently published in a final EIR.  (Cal. Code Regs., tit. 14, §§ 15088—15089, 15204, subd. (a).)

commenter further objected that the draft EIR was misleading because the concept plan "gives the public the impression that something approaching that plan will be built even though the Development Agreement allows different parts of the Project site to be sold to different developers who may choose to build something that bears no real resemblance to the Concept Plan." Further, the commenter observed, the "Development Agreement also provides that no subsequent approvals/environmental review would be required for any subsequent build-out of the Project." The commenter warned that the draft EIR's "enigmatic project description has the effect of cutting the public out of some of the more important questions about the Project.  And it certainly cannot provide the City Council with enough information to support a Statement of Overriding Considerations."

Another citizen complained that it was "difficult to respond to a project that does not include a specific proposal."  And, another complained that the project description "is unclear and seems intentionally nebulous."  Despite these objections, the City made no modifications to the project description in the final EIR.

On July 23, 2013, the Los Angeles City Council gave final approval of Millennium's project.

E.      Mandamus Petition

On August 28, 2013, Stopthemillenniumhollywood and Beachwood Canyon Neighborhood Association filed a petition asking for a peremptory writ of mandate directing the City to set aside the approval of the project and certification of the EIR.  An amended petition was filed on September 5, 2014.

14

The first amended petition alleged three causes of action for violations of CEQA.[6]  The first cause of action alleged, inter alia, that the City had prejudicially abused its discretion by failing to provide an accurate, stable, and finite project description.  The second cause of action alleged, inter alia, that the City had prejudicially abused its discretion by declining to study the traffic impacts of the proposed Millennium project on the 101 Freeway, despite Caltrans's direction that it do so.  The third cause of action alleged, inter alia, that the City had failed to notice and consult with the California Geological Survey regarding potential seismic hazards at the project site.

F.    Trial Court's Order

On April 30, 2015, the trial court granted the petition for writ of mandate as to the first and second causes of action, but denied it as to the third cause of action.  The trial court explained as follows:

Quoting *County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185 (*County of Inyo*), the trial court explained " '[a]n accurate, stable, and [consistent] project description is the *sin[e] qua non* of an informative and legally sufficient EIR' " because a shifting project description may confuse the public and public decision-makers, thus vitiating the EIR's usefulness as a vehicle for intelligent public participation.  Accordingly, a project description "should be sufficiently detailed to provide a foundation for a complete analysis of the environmental impacts,"

---

[6]    The first amended petition also contained non-CEQA causes of action, but because they are not relevant to this appeal, we do not discuss them.

15

and it should include all project components and "apprise the parties of the true scope of the project."

The trial court concluded that the project description in the present case was neither stable nor finite. The court characterized the final EIR as providing only a "blurred view of the project," noting that the LUEP, development regulations, and Q Condition No. 1 approved an "envelope" of *potential* residential, commercial, retail and office projects that would not have more than a maximum design mass and height, and would create no more than maximum levels of air pollution and traffic impacts.[7] Analyzing a "set of environmental impact limits," instead of analyzing the environmental impacts for a defined project, was not consistent with CEQA. Quoting *Burbank-Glendale-Pasadena Airport Authority v. Hensler* (1991) 233 Cal.App.3d 577, the trial court held CEQA demanded instead that " 'the defined project and not some different project must be the EIR's bona fide subject.' " Indeed, the court noted an EIR that does not provide decision-makers, and the public, with adequate information about the project "fails as an informational document."

Acknowledging that there may be times when a project description setting forth only the project's physical parameters

---

[7] The trial court considered the use of the disjunctive "or" in the project's Q Condition of Approval No. 1 to give the developer the ability to choose from any of the long list of land uses expressly permitted in the C2 zone. Whether intended by the City, the express language of that condition provided Millennium even greater latitude to re-design and reconfigure the project. The trial court found that this possibility was not subject to environmental analysis and, therefore, the City's approval of this condition violated CEQA.

16

and maximum environmental impacts may be reasonable, the trial court found those circumstances were not present in this case. The court distinguished *Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036 (*Treasure Island*), in which the island had been contaminated by hazardous materials that required cleanup, and the developer could not be sure when the island would be available for development. In that unusual circumstance, the *Treasure Island* court had concluded that a project description that included both fixed elements (such as street layouts) and conceptual elements (such as the shape of buildings or specific landscape designs) was all that could be meaningfully provided at present. Once additional project features were known, those would "be likely subjects of supplemental review before a final design was implemented." The trial court concluded that the unique circumstances present in *Treasure Island* were entirely absent in the present case. The court noted that the Millennium project site did not contain hazardous substances or other external variables that made the nature and timing of development unknown or unknowable, nor was there any planned supplemental environmental review, any external conditions creating uncertainty, or any reason the project developer could not be specific about project details. Thus, the trial court concluded: "While CEQA does not require a project to be defined down to the last detail, Millennium's uncertainty about market conditions or the timing of its build-out is an insufficient ground for the ambiguous and blurred Project Description."

Additionally, the trial court held that the conceptual approach used to define the project in this case impermissibly

17

deferred a portion of the environmental impacts analysis. It noted that without knowing which of the project "concepts" would ultimately be built, the EIR could not (and did not) explain how the developers would avoid exceeding the maximum impacts when the project was finally designed and built. Moreover, the LUEP allowed Millennium to transfer or change uses within the project, and it allowed the planning director to approve a change request if the request demonstrated that it was consistent with the maximum allowable number of increased vehicle trips (trip captures) and did not exceed the maximum environmental impacts identified in the EIR. The trial court asked, "But how will the Planning Director make that determination for changing the Project and using what criteria?" It noted that since no additional CEQA review was required to ensure that Millennium was within maximum environmental standards, and no public input would be allowed, the final EIR essentially "defers the environmental assessment of the Project and ultimately fails to ensure that the finally designated Project will not be approved without all necessary mitigations of environmental harm."

In finding the project definition impermissibly ambiguous, the trial court returned to the underlying informational purposes of CEQA. Citing *National Resources Defense Council v. City of Los Angeles* (2002) 103 Cal.App.4th 268, the trial court held the environmental review process mandated by CEQA was "intended to provide the fullest information reasonably available on which the decision-makers and the public can rely in determining whether to start a project." When properly drafted, an EIR furnishes both the road map and the environmental price tag for the project so that the decision maker and the public both know how much they and the environment will have to give up in order

18

to take that journey.  In the present case, however, the ambiguous project description rendered this "price tag" unascertainable and deferred significant portions of the environmental analysis.  As a result, CEQA's "informational and substantive requirements were violated."  Accordingly, the court vacated the EIR and the entitlements it purported to support.[8]

Following a decision on non-writ causes of action, the trial court entered judgment on March 17, 2017.  Millennium, the City, and Stopthemillennium timely appealed.

## DISCUSSION

### A.    Standard of Review

A court's inquiry in a CEQA case " 'shall extend only to whether there was a prejudicial abuse of discretion.  Abuse of discretion is established if the agency has not proceeded in the manner required by law or if the determination or decision is not supported by substantial evidence.' "  (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392, quoting Pub. Resources Code, § 21168.5.)

In evaluating whether an agency has abused its discretion, a reviewing court must adjust its scrutiny depending on whether the claim is predominantly one of improper procedure or a dispute over the facts.  The court determines de novo whether the agency has failed to proceed in the manner prescribed by CEQA, but reviews for substantial evidence an agency's resolution of a factual dispute over whether " 'adverse effects have been

---

[8]    The trial court also heard and decided whether the City's analysis of the project's traffic and seismic impact analysis met the legal requirements of CEQA.  These rulings will not be considered here as we conclude that the project description used in this case was legally insufficient.

19

mitigated or could be better mitigated.' " (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435.)

Regarding the question of whether the EIR's project description complied with CEQA's requirements, the standard of review is de novo. (*Washoe Meadows Community v. Department of Parks & Recreation* (2017) 17 Cal.App.5th 277, 286—287 (*Washoe Meadows*); *see also Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 513.)

> B.  Analysis
>> 1.  The Project Description Was Not "Accurate, Stable and Finite" as Required Under CEQA.

A draft EIR must contain a project description. (Cal. Code Regs., tit. 14, § 15124.)[9] That project description must include (a) the precise location and boundaries of the proposed project, (b) a statement of the objectives sought by the proposed project, (c) a general description of the project's technical, economic and environmental characteristics, and (d) a statement briefly describing the intended use of the EIR. (*Id.*, § 15124, subds. (a)—(d).)

This description of the project is an indispensable element of both a valid draft EIR and final EIR. (*Washoe Meadows*, *supra*, 17 Cal.App.5th at p. 287, citing *Western Placer Citizens for an Agricultural & Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 898.) That project description must be

---

[9]     The regulations implementing CEQA are codified at California Code of Regulations, title 14, section 15000 et seq., and are referred to as the State CEQA Guidelines (hereafter Guidelines).

20

accurate, stable and finite. (*County of Inyo*, *supra*, 71 Cal.App.3d at p. 193.)

*County of Inyo* was the first decision to articulate the need for a definite and unambiguous project description as part of CEQA's environmental review process. In that case, the project involved the extraction of subsurface water in the Owens Valley by the City's Department of Water and Power. (*County of Inyo*, *supra*, 71 Cal.App.3d at p. 189.) Although the EIR initially described the project as a proposed increase of 51 cubic square feet of subsurface water, other portions of the EIR discussed proposals far broader than the initially described project. (*Id.* at p. 190.)

The *County of Inyo* court acknowledged that the EIR adequately described the broader project's environmental effects, and thus the informative quality of the EIR's environmental forecasts were not affected by the "ill-conceived, initial project description." (*County of Inyo*, *supra*, 71 Cal.App.3d at p. 197 ["The elasticity of the project concept does not vitally affect the 'impact' sections of the report."].) Nonetheless, the court concluded that the "incessant shifts" among different project descriptions "vitiate[d] the City's EIR process as a vehicle for "intelligent public participation," because "[a] curtailed, enigmatic or unstable project description draws a red herring across the path of public input." (*Id.* at pp. 197, 198.)

More recently, in *Washoe Meadows*, *supra*, 17 Cal.App.5th 277, the requirement in CEQA of a clear and unambiguous project description was reiterated. In that case, the Department of Parks and Recreation (the Department) proposed the " 'Upper Truckee River Restoration and Golf Course Reconfiguration Project.' " (*Id.* at pp. 282—283.) The draft EIR identified five

21

alternatives for the project without specifying a preferred alternative.  (*Id*. at 283.)  Rather, the Department would select a preferred alternative after "receipt and evaluation of public comments."  (*Ibid*.)  A discussion of that decision would be included in the final EIR.  (*Ibid*.)

The Court of Appeal found the open-ended and indefinite project description utilized by the Department was legally impermissible under CEQA.  "Dispositive of this appeal is the [draft] EIR's failure to provide the public with an accurate, stable and finite description of the project."  (*Washoe Meadows*, *supra*, 17 Cal.App.5th at p. 285.)  The Department was able to provide certainty; it had selected a preferred alternative as part of its public scoping process for the project.  (*Id*. at pp. 282–283.)  But, for some reason, it simply failed to describe a project at all. "Instead, it presented five different alternatives for addressing the Upper Truckee River's contribution to the discharge of sediment into Lake Tahoe, and indicated that following a period for public comment, one of the alternatives, or a variation thereof, would be selected as the project."  (*Id*. at p. 285.)

It did not matter to the *Washoe Meadows* court that the draft EIR thoroughly analyzed the alternative that was ultimately selected in the final EIR.  "[T]he problem with an agency's failure to propose a stable project is not confined to 'the informative quality of the EIR's environmental forecasts.' " (*Washoe Meadows*, *supra*, 17 Cal.App.5th at p. 288.)  Rather, a failure to identify or select a project at all "impairs the public's right and ability to participate in the environmental review process."  (*Ibid*.)

The requirement of an accurate, stable, and finite project description as the *sine qua non* of an informative and legally

22

sufficient EIR has been reiterated in a number of cases since *County of Inyo.* (See, e.g., *Treasure Island, supra,* 227 Cal.App.4th at p. 1052 ["This court is among the many which have recognized that a project description that gives conflicting signals to decision makers and the public about the nature and scope of the project is fundamentally inadequate and misleading"]; *Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 85—89 [EIR failed as an informal document because the project description was inconsistent and obscure as to the true purpose and scope of the project]; *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 653 [an EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project].)

In this case, the project description is not simply inconsistent, it fails to describe the siting, size, mass, or appearance of any building proposed to be built at the project site. The draft EIR does not describe a building development project at all. Rather, it presents different conceptual scenarios that Millennium or future developers may follow for the development of this site. These concepts and development scenarios—none of which may ultimately be constructed—do not meet the requirement of a stable or finite proposed project.

The development regulations that were incorporated into the project description provide the public and decision makers little by way of actual information regarding the "design features" or the "final development scenario." Rather, these regulations simply limit the range of construction choices for future developers. And, even the limits imposed are vague and

23

ambiguous.  While future developers are to create a mixed-use development, eliminate the visual impact of current on-site parking, establish, where feasible, pedestrian linkages to existing public transit, and "provide designs that address, respect and complement the existing context, including standards for ground-level open space, podium heights and massing setbacks," no particular structure or structures are required to be built.

In support of their argument that the conceptual "impacts envelope" of project alternatives employed in the EIR complies with CEQA, appellants erroneously assert that so long as the worse-case-scenario environmental effects have been assumed, analyzed, and mitigated, and so long as no development takes place that exceeds those mitigation measures, CEQA's purpose has been fully satisfied.  That argument was made and roundly rejected in *County of Inyo*, and *Washoe Meadows*.  CEQA's purposes go beyond an evaluation of theoretical environmental impacts.  "If an EIR fails to include relevant information and precludes informed decisionmaking and public participation, the goals of CEQA are thwarted and a prejudicial abuse of discretion has occurred."  (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 128.)

Nor does *South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321 (*South of Market*) suggest a different rule.  In that case, the Court of Appeal confirmed the proposition that an " 'accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR.' "  (*Id.* at p. 332, citing *County of Inyo*, *supra*, 71 Cal.App.3d at p. 199.)  " 'Only through an accurate view of the project may affected outsiders and public decision makers balance the proposal's benefit against its

24

environmental costs, consider mitigation measures, assess the advantage of terminating the proposal . . . and weigh other alternatives in the balance.' " (*South of Market*, *supra*, 33 Cal.App.5th at p. 332.)

In *South of Market*, however, the project description was neither " 'curtailed, enigmatic or unstable.' " (*South of Market*, *supra*, 33 Cal.App.5th at pp. 327—328.) The draft EIR described a mixed-use development that would preserve and rehabilitate two existing buildings and construct four new buildings at the project site. The only uncertainty challenged by the opponents of the project was that the draft EIR did not commit to whether the buildings would be used predominately as office space or residential units. (*Id.* at p. 332.) "Plaintiffs do not dispute the [draft] EIR's project description met CEQA technical requirements, and do not describe any information that was required to be included in the project description but was not." (*Ibid.*) In fact, the draft EIR included "site plans, illustrative massing, building elevations, cross-sections and representative floor plans for both options." (*Id.* at p. 333.) Thus, the project description met the information required by the guidelines. (*Id.* at p. 332 [requiring a general description of the project's technical, economic and environmental characteristics].)

In the present case, the project description fails to meet this basic Guidelines requirement. The technical characteristics of the construction project—such as was provided in *South of Market*—were not provided here. The draft EIR did not contain site plans, cross-sections, building elevations, or illustrative massing to show what buildings would be built, where they would be sited, what they would look like, and how many there would be.

Moreover, as noted by the trial court, there were no practical impediments as to why Millennium could not have provided an accurate, stable, and finite description of what it intended to build. Unlike the *Treasure Island* developer, there were no contaminated sites on this property that interfered with making any firm commitment as to whether development would be possible and, if so, what type of development. (*See Treasure Island*, *supra,* 227 Cal.App.4th at p. 1054 [given the soil, groundwater and structural contamination on Treasure Island, the EIR could not be faulted for not providing detail that "does not now exist"].) In fact, in its earliest proposals regarding the project, Millennium clearly described what it proposed to build on its two parcels in Hollywood.

Nor, as in *Treasure Island*, would the Millennium development's future configuration be subject to "supplemental review" before the "final Project design" is implemented. (*See Treasure Island*, *supra*, 227 Cal.App.4th at p. 1054.) This lack of further environmental review is another significant difference between the circumstances presented in *Treasure Island* and those present here.

> 2. The EIR's Ambiguous Project Description Prejudicially Impairs the Public's Ability to Participate in the CEQA Process.

The failure to comply with CEQA's informational requirements does not require reversal unless there is prejudice. (Pub. Resources Code, § 21005, subd. (b).) Such prejudice is found, however, if the failure to include relevant information precludes informed decision making and informed public comment. (*Washoe Meadows*, *supra*, 17 Cal.App.5th at p. 290.) The omission of relevant information is deemed prejudicial

26

" 'regardless of whether a different outcome would have resulted if the public agency had complied with those provisions.' " (*Id.* at p. 290, citing Pub. Resources Code, § 21005, subd. (a); *Rural Landowners Assn. v. City Council* (1983) 143 Cal.App.3d 1013, 1021.)

In this case, Millennium's failure to present any concrete project proposal, instead choosing concepts and "impact envelopes" rather than an accurate, stable, and finite project, was an obstacle to informed public participation, "even if we cannot say such input would have changed the project ultimately selected and approved." (*Washoe Meadows*, *supra*, 17 Cal.App.5th at p. 290.) Accordingly, the trial court correctly invalidated the EIR and granted the CEQA writ petition.

### 3. Need Not Reach the Remaining Arguments on Appeal

The parties raise other issues regarding the EIR's sufficiency on appeal, including, inter alia, whether the City is required by law to use Caltrans's methodology for the study of traffic effects, whether the City was required to consider cumulative effects, including those on the 101 Freeway, in evaluating the project under CEQA, and whether the seismic issues were sufficiently disclosed. Given that the project description is fatally defective and supports the trial court's decision to issue the writ, we need not reach these issues. " 'An opinion sufficiently states "reasons" if it sets forth the "grounds" or "principles" upon which the justices concur in the judgment.' " (*People v. Garcia* (2002) 97 Cal.App.4th 847, 853, citing *Lewis v. Superior Court* (1999) 19 Cal.4th 1232, 1262.) An appellate court is not required to address every one of the parties' respective

arguments or express every ground for rejecting every contention advanced by every party.[10]  (*People v. Garcia*, at p. 853.)

---

[10]     Contrary to appellants' contention at oral argument, Public Resources Code section 21168.9 does not mandate that we rule on every issue presented on appeal.  Rather, that section provides that the trial court's order, upon remand, shall include only those mandates that are necessary to achieve CEQA compliance.  (*City of Redlands v. County of San Bernardino* (2002) 96 Cal.App.4th 398, 416.)

**DISPOSITION**

The judgment is affirmed. Stopthemillennium shall recover their costs on appeal. The League of Cities' request for judicial notice is denied.

JONES, J.*

We concur:

EDMON, P. J.

LAVIN, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 8/22/19

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| STOPTHEMILLENNIUMHOLLYWOOD.COM et al., <br><br>     Plaintiffs and Appellants, <br><br>     v. <br><br> CITY OF LOS ANGELES et al., <br><br>     Defendants and Appellants; <br><br> MILLENNIUM HOLLYWOOD LLC, <br><br>     Real Party in Interest and Appellant. | B282319 <br><br> (Los Angeles County Super. Ct. No. BS144606) <br><br> ORDER CERTIFYING OPINION FOR PUBLICATION [NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above entitled matter filed on July 31, 2019, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

1

_____
EDMON, P. J.          JONES, A.*          LAVIN, J.

_____

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.