[No. G001733. Fourth Dist., Div. Three. Oct. 30, 1985.]

FRANK A. DUSEK, Individually and as Trustee, etc., et al.,
Plaintiffs and Appellants, v.
REDEVELOPMENT AGENCY OF THE CITY OF ANAHEIM,
Defendant and Respondent.

COUNSEL

Rutan & Tucker, Leonard A. Hampel, Jeffrey M. Oderman and Craig Labadie for Plaintiffs and Appellants.

William P. Hopkins, City Attorney, Weiser, Kane, Ballmer & Berkman, Bruce D. Ballmer, Kathryn Reimann, Lance E. Garber and R. Bruce Tepper, Jr., for Defendant and Respondent.

OPINION

WALLIN, J.—Frank and Herma Dusek, the owners of the Pickwick Hotel in downtown Anaheim, appeal the denial of their petition for a peremptory writ of mandate.[1] They contend respondent Anaheim Redevelopment Agency's (Agency) certification of a supplemental environmental impact report and approval of the demolition of the Pickwick, a registered historic monument, violated the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et seq.) On this basis, the petition seeks to have both actions set aside and to prevent the Agency from proceeding with the acquisition and demolition of the Pickwick.

In 1973, the City of Anaheim adopted a redevelopment plan to redesign, clear, reconstruct, or rehabilitate blighted areas pursuant to the Community Redevelopment Law. (Health & Saf. Code, § 33000 et seq.) The Pickwick is located on a 7.55-acre parcel (Parcel 10) within the larger 200-acre Project Alpha targeted for redevelopment. It is presently a dilapidated two-story structure, housing primarily transient gentlemen on a daily or weekly basis. The Pickwick is not discussed, or even mentioned, in the 1973 environmental impact report (1973 EIR) prepared and certified prior to adoption of the redevelopment plan.

In 1976, a subsequent EIR (1976 EIR) was drafted and the redevelopment plan was amended. The Pickwick was identified as one of several potential

---

[1] A final judgment was never entered. Although this appeal is technically premature, we have treated the order denying the writ as a final judgment to facilitate resolution of this controversy. (*Walters* v. *County of Plumas* (1976) 61 Cal.App.3d 460, 463 [132 Cal.Rptr. 174]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 70, pp. 4083-4084.)

historic buildings. The report stated a full study of these historic sites would become necessary when implementation proposals were presented. No specific development proposals were included for Parcel 10.

In 1978, the Agency prepared the "Downtown Anaheim Guide for Development" identifying several large parcels, including Parcel 10, for the first time. There was no EIR drafted in conjunction with this guide. Late in 1978, the Agency sought development proposals for Parcel 10. The Duseks were contacted and although they expressed the desire to retain the Pickwick, they failed to present a proposal for review and evaluation for over two years. The Agency entered into an exclusive negotiating agreement with a developer in hopes of obtaining a specific development plan for the parcel.

Although the agreement was extended four times, by early 1981 the developer informed the agency it was no longer interested in pursuing the project. The uncertainty surrounding renovation or acquisition of the Pickwick was cited as a primary reason for withdrawing its proposal.

In April 1981, the Duseks presented their own proposal to invest $1 million to renovate the Pickwick. They never expressed any interest in participating in the redevelopment of the entire parcel. Under their proposal, the first floor is to be converted to retail space and the second floor to senior citizen housing. Private bathrooms are to be available in less than half of the proposed 50 rooms with the remaining residents required to use communal facilities. Only one kitchen is to be constructed. The planning staff concluded the proposal did not satisfy Agency standards for housing assistance and did not comply with the redevelopment plan.

On June 9, 1981, after hearings before both the community redevelopment commission and the Agency, the Agency voted to acquire the Pickwick. It later directed its staff to have an EIR prepared.

The supplemental EIR (1983 EIR) was drafted even though no specific development plan had been presented. The Agency hoped that resolution of the Pickwick issue would increase marketability of the parcel and attract interested developers. It describes the project as the acquisition of properties within Parcel 10, the demolition of all existing improvements thereon, and the construction of up to 350,000 square feet of new office and retail uses. The cumulative environmental impacts of the project on land use, circulation, noise, public facilities, service, and utilities are documented and analyzed. The EIR emphasizes that "the most significant impact of the proposed project is the removal of the Pickwick. This would constitute an adverse impact to Anaheim's historic resources."

The 1983 EIR also contains a "no project" alternative description based on estimated projections from the 1976 EIR rather than the existing environment. Using the 1976 EIR analysis of parcel size and land use, a prototypical development on the site would contain 175,000 square feet of commercial floor space. This was used as the "no project" alternative, including removal of all existing uses on Parcel 10. The comparative analysis of the environmental impact of four other proposed alternatives focused on this "no project" alternative. In addition, there is raw data on traffic, land use, and utilities scattered throughout the report comparing the various alternatives to the existing environment.

On September 6, 1983, the Agency certified the 1983 EIR but approved *only* the demolition of the Pickwick and not the redevelopment of the entire parcel. The Agency considered the adverse environmental impacts detailed in the 1983 EIR as they pertained to the acquisition and clearance of Parcel 10 and made findings in mitigation. However, it did not make any findings regarding the adverse impacts and necessary steps in mitigation of the ultimate redevelopment of the parcel as the defined project. The Agency also outlined the overriding considerations justifying demolition, including the benefits involved in redeveloping the entire parcel.

Thereafter the Agency began condemnation proceedings. In a separate action still pending, it is appealing the dismissal of those proceedings. Meanwhile the Duseks have pursued appellate review of the Agency's compliance with CEQA. This is the task with which we are confronted.

The Duseks have assembled over 2,000 pages of documents, letters, reports, minutes, pleadings, records, notices, and memoranda and nearly 100 pages of argument to support their CEQA challenge. Typical of such an attack, this mass of information has been compiled to convince us that political decisionmakers have ignored or misapplied CEQA in certifying an environmental impact report and approving a project. Although the Duseks lodge four separate and technical complaints about the 1983 EIR and the Agency action, we must decide whether the fundamental purposes of CEQA have been satisfied or whether the matter must be returned to the Agency for another try.

*The Fundamental Objectives of CEQA*

In enacting CEQA, the Legislature intended to implement those steps necessary "to provide a high-quality environment that at all times is healthful and pleasing to the senses and intellect of man." (Pub. Resources Code, § 21000, subd. (b).) Recognizing the finite limitation on the capacity of the environment, the Legislature directed governmental decisionmakers to

"take immediate steps to identify any critical thresholds for the health and safety of the people of the state and take all coordinated actions necessary to prevent such thresholds being reached." (Pub. Resources Code, § 21000, subd. (d).) Hence the Legislature expressly stated the policy of the state is to: "(a) Develop and maintain a high-quality environment now and in the future, and take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state. [¶] (b) Take all action necessary to provide the people of this state with clean air and water, enjoyment of aesthetic, natural, scenic, and historic environmental qualities, and freedom from excessive noise." (Pub. Resources Code, § 21001, subds. (a) and (b).)

■ A very similar concern for the health, safety, and general welfare of the people is embodied in the Community Redevelopment Law. (Health & Saf. Code, § 33000 et seq.) The Legislature identified the existence of blighted areas within many communities "which constitute either social or economic liabilities, or both, requiring redevelopment in the interest of the health, safety, and general welfare of the people of such communities and of the State." (Health & Saf. Code, § 33030.) Redevelopment complements CEQA; both aim at improvement of the environmental quality of life. Therefore, a redevelopment agency must comply with CEQA in adopting and implementing a redevelopment plan. (Health & Saf. Code, § 33352, subd. (i).)

CEQA dictates when and how an environmental impact report must be prepared (Pub. Resources Code, §§ 21100, 21151; Cal. Admin. Code, tit. 14, §§ 15120-15132) as well as the procedures public agencies must follow in considering the report and approving a project. (Pub. Resources Code, § 21081; Cal. Admin. Code, tit. 14, §§ 15090, 15091, 15092, 15093.) California courts have consistently emphasized the significance of the EIR. "The EIR is the heart of the environmental control process. [Citation.] CEQA describes the report's purpose—to provide the public and governmental decision-makers . . . with detailed information of the project's likely effect on the environment; to describe ways of minimizing significant effects; to point out alternatives to the project. [Citations.] The EIR process facilitates CEQA's policy of supplying citizen input. [Citation.] By depicting the project's unavoidable effects, mitigation measures and alternatives, the report furnishes the decision-maker information enabling it to balance the project's benefit against environmental cost. [Citations.] The report should function as an *environmental 'alarm bell.'* [Citation.]" (*County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 192 [139 Cal.Rptr. 396], italics added.)

■ An EIR submitted to a redevelopment agency must serve as the "alarm bell" alerting the agency to potential adverse environmental impacts

arising from projects designed to improve the environment in blighted areas. CEQA is not meant to impede redevelopment. It simply compels redevelopment decisionmakers to thoroughly evaluate any adverse impacts of a redevelopment project and to take all possible steps to mitigate those environmental costs. The EIR serves as the informational tool to facilitate informed decisionmaking. Moreover, CEQA assures the public the opportunity to influence decisionmakers by requiring a written compilation of the comments made by the public and a written response by the responsible agency to the registered concerns and criticisms. "The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations." (*Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 [118 Cal.Rptr. 249, 529 P.2d 1017].)

*The Duseks' CEQA Arguments*

The Duseks urge us to set aside approval of the acquisition of the Pickwick and to require the preparation of a new EIR because the Agency did not strictly comply with CEQA requirements. They point to the alleged commission of four CEQA sins:

■ 1. *Changed Project Description.* The project was described in the 1983 EIR as the acquisition and clearance of all existing improvements on Parcel 10 and the construction of up to 350,000 square feet of marketable space. However, by approving *only* the demolition of the Pickwick, the Agency improperly changed the description of the project. This belated revision was a fraud on the public and certainly "[drew] a red herring across the path of public input." (*County of Inyo* v. *City of Los Angeles, supra,* 71 Cal.App.3d 185, 198.) A new draft EIR, properly describing the project, should be prepared and recirculated.

■ 2. *Failure to Consider Cumulative Adverse Impacts.* The Agency improperly chopped its project into bite size pieces by approving the acquisition and demolition of the Pickwick prior to considering the potential environmental impacts of the ultimate redevelopment of the entire parcel. (Pub. Resources Code, § 21083, subd. (b); Cal. Admin. Code, tit. 14, § 15130; *Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d 263, 283-284.)

■ 3. *Improperly Included Overriding Considerations Beyond the Scope of Action Approved.* Included in the list of factors justifying demolition are the benefits of redeveloping Parcel 10. The Agency may not ignore the cumulative adverse environmental impacts of development and at the

same time use the corresponding benefits as overriding considerations. Moreover, the Agency has not and cannot identify any positive overriding considerations to justify the act of demolishing a national historic landmark.

4. *No Project Alternative.* The 1983 EIR, in comparing the projected development of 350,000 square feet of office and retail space to the 175,000 square feet extrapolated from the 1976 EIR, failed to include a "no project" alternative. (Cal. Admin. Code, tit. 14, § 15126, subd. (d)(2).) The 1983 EIR was defective because it mistakenly defined the "no project" alternative as a hypothetical development plan rather than the existing environment. The EIR should have described a true "no project" by comparing the various alternatives to maintaining the status quo, that is the existing environment.

■■■ *Discarding the Labels: Did the 1983 EIR and the Agency's Approval of Part of the Project Satisfy the Fundamental Purposes of CEQA?*

The Duseks' demand for strict compliance relates more to labeling and form than it does to the underlying objectives of CEQA. We have considered the Agency's resolution approving acquisition in light of the policies expressly fostered by CEQA and the Community Redevelopment Law. We have reread the 1983 EIR and the Agency's action discarding the magic labels "no project alternatives," "project description," "cumulative impacts," and "overriding considerations." And most importantly, we have reviewed the report and the action adopted by the Agency to determine whether the fundamental purposes of CEQA have been satisfied.

The Agency is charged with responsibility for implementing Anaheim's Redevelopment Plan. In meeting this responsibility it is now endeavoring to improve the environmental quality of a blighted area, specifically Parcel 10. Its previous attempts to obtain specific development plans for this parcel proved futile because of the unresolved controversy surrounding the retention or clearance of the Pickwick. Hence, it became necessary for the Agency to decide whether the Pickwick was a social and/or economic liability and if so, whether the health, safety, and welfare of the people in the community justified the loss of a registered historical landmark. It was incumbent upon the Agency to consider the complementary objectives of the Community Redevelopment Law and CEQA and to remove existing downtown blight only after thoroughly considering all of the environmental costs, including the loss of the Pickwick.

The 1983 EIR rang the environmental alarm bell loud and clear. Every reader was dramatically alerted to the recommended irretrievable loss of

the Pickwick. It was identified as the most significant impact of the project. The public, including the Duseks, had notice of the potential demolition and the opportunity to persuade decisionmakers of the unacceptable environmental price of sacrificing an historic building. The Agency was provided with four alternatives to demolition; each involved renovation of the Pickwick together with varying levels of development. Moreover, the EIR described steps necessary to mitigate the adverse effect of displacing the Pickwick's residents.

Having considered the 1983 EIR, the Agency concluded the loss of the Pickwick was justified as a necessary prerequisite to redevelopment of Parcel 10. We have concluded the fundamental objectives of CEQA have thus been satisfied and, therefore, the petition was properly denied. Nevertheless, we will briefly describe our rationale for forgiving, what the Duseks consider unforgivable, the four CEQA sins described above.

*Scope of Review*

The scope of our review is statutorily prescribed: "In any action or proceeding, . . . to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (Pub. Resources Code, § 21168.5.) There is an abundance of judicial comment on the proper application of this section.

■ "In reviewing an EIR a paramount consideration is the right of the public to be informed in such a way that it can intelligently weigh the environmental consequences of any contemplated action and have an appropriate voice in the formulation of any decision. But the following principles must also be considered. The EIR is not an action document. Its purpose is to inform governmental decision makers and to focus the political process upon their action affecting the environment." (*Karlson* v. *City of Camarillo* (1980) 100 Cal.App.3d 789, 804 [161 Cal.Rptr. 260].) Therefore, in reviewing whether either the EIR or the procedures followed fully comply with CEQA, "the test to be applied is not one demanding of absolute perfection but whether an objective, good faith effort to so comply is demonstrated." (*Mount Sutro Defense Committee* v. *Regents of University of California* (1978) 77 Cal.App.3d 20, 37 [143 Cal.Rptr. 365]; see also *Village Laguna of Laguna Beach, Inc.* v. *Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1029 [185 Cal.Rptr. 41].)

"Even where specific guidelines have been urged upon the courts as requiring a narrow and restricted approach by the governmental agency, the courts have followed the general tenor of the guidelines, indicating that they are subject to a construction of reasonableness and the court will not seek to impose unreasonable extremes or to inject itself within the area of discretion as to the choice of action to be taken." (*Karlson* v. *City of Camarillo, supra,* 100 Cal.App.3d 789, 805.) Such reasonableness tends to imply substantial compliance with CEQA and precludes a finding of an abuse of discretion. (*Mount Sutro Defense Committee* v. *Regents of University of California, supra,* 77 Cal.App.3d 20, 43.)

Hence, we review the Duseks' allegations with these principles in mind. Our search is for reasonableness, an objective good faith effort to follow the requirements, and substantial compliance with CEQA.

■■■ 1. *Changed Project Description: Did the Redevelopment Agency abuse its discretion by certifying a supplemental EIR defining a proposed project but approving only a portion or part of the project?*

In other words, can there be a discrepancy between the project description and the project approved? Relying on *County of Inyo* v. *City of Los Angeles, supra,* 71 Cal.App.3d 185 and *Sutter Sensible Planning, Inc.* v. *Board of Supervisors* (1981) 122 Cal.App.3d 813 [176 Cal.Rptr. 342], the Duseks argue an emphatic no.

"A curtailed or distorted project description may stultify the objectives of the reporting process. Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, and assess the advantage of terminating the proposal (i.e., the 'no project' alternative) and weigh other alternatives in the balance. An accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR." (*County of Inyo* v. *City of Los Angeles, supra,* 71 Cal.App.3d 185, 192-193.)

The *Inyo* decision was preceded by years of litigation and prior appeals. The city had been ordered to prepare an EIR for a project involving increased pumping for export via two aqueducts. However, the EIR actually prepared included a much narrower description. "The final EIR represents an ex parte attempt to narrow the city's CEQA obligation—and the scope of this lawsuit—down to the relatively small flow of underground water destined for in-valley use." (*Id.,* at p. 195.) The problems did not end here. Throughout the report, the description varied. Therefore, the court con-

cluded, "The incessant shifts among different project descriptions do vitiate the city's EIR process as a vehicle for intelligent public participation." (*Id.,* at p. 197.) The use of a narrow project description as a "launching pad" frustrated CEQA's public information aims. (*Id.,* at pp. 199-200.)

In *Sutter Sensible Planning, Inc.* v. *Board of Supervisors, supra,* 122 Cal.App.3d 813, 818 the board, having received numerous critical comments, determined the final EIR needed to be revised. The revised draft was not recirculated for public comment. The court found the failure to recirculate was a fatal procedural deficiency under CEQA because potentially valuable public input was lost.

Our situation is vastly different from that arising in either *Inyo County* or *Sutter Sensible.* The project description here is much broader than the project actually approved. However, the Agency action did not draw the infamous "red herring across the path of public input" and therefore did not "stultify the objectives of the reporting process." (*County of Inyo* v. *City of Los Angeles, supra,* 71 Cal.App.3d 185, 198, 192.) Retention or demolition of the Pickwick was the focal point of the EIR. The adverse environmental impact of demolition was expressly recognized and considered and the public input directly concerned that question.

CEQA does not handcuff decisionmakers in the manner proposed by the Duseks. The action approved need not be a blanket approval of the entire project initially described in the EIR. If that were the case, the informational value of the document would be sacrificed. Decisionmakers should have the flexibility to implement that portion of a project which satisfies their environmental concerns. Here public attention was properly focused on demolition of the Pickwick and interested parties were provided with the opportunity to voice their opposition. The Agency did not abuse its discretion by adopting a narrower project than initially envisioned.

 2. *Failure to Consider Cumulative Adverse Impacts: Did the Agency abuse its discretion by approving part of the project after considering only the adverse environmental impacts of the approved project?*

At the time the EIR was prepared and considered and the demolition was approved, the Agency was in an unenviable predicament. It was unable to define a project in conjunction with a proposed specific development plan because the uncertainty of the Pickwick's fate stifled interest in the parcel. Its objective was to resolve that central issue. Therefore, a conceptual project was presented for the entire parcel to avoid "chopping up [the] proposed [project] into bite-size pieces" (*Plan for Arcadia, Inc.* v. *City Council of*

*Arcadia* (1974) 42 Cal.App.3d 712, 726 [117 Cal.Rptr. 96]) and thereby understating the cumulative environmental impacts.

"Cumulative impacts shall be discussed when they are significant. . . . The discussion of cumulative impacts shall reflect the severity of the impacts and their likelihood of occurrence, but the discussion need not provide as great detail as is provided of the effects attributable to the project alone. The discussion should be guided by the standards of practicality and reasonableness." (Cal. Admin. Code, tit. 14, § 15130(a)(b).) The project description and the proposed alternatives in essence fulfilled this purpose.

The project was reduced in scope by the Agency's limited approval. However, the Agency has conceded from the outset that demolition of the Pickwick is an anticipated first step to ultimate redevelopment of Parcel 10. It is a preliminary step designed to attract more specific development plans. (See, e.g., *Lake County Energy Council* v. *County of Lake* (1977) 70 Cal.App.3d 851 [139 Cal.Rptr. 176].) The projected environmental consequences of the anticipated redevelopment are set forth in the alternatives presented, including the severity of the impacts and their likelihood of occurrence. The Agency thereby avoided violating CEQA by considering demolition in a vacuum. The discussion of the alternatives as possible cumulative impacts was both practical and reasonable. We can find no abuse of discretion.

Nor does *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151 [217 Cal.Rptr. 893] suggest a different result. In *Citizens,* the lead governmental agency evaded environmental scrutiny by bifurcating its approval of a shopping center development and making separate negative declarations as to each of the two separately defined projects. An EIR was never prepared and the citizens' environmental concerns were never considered.

Here, the Anaheim Redevelopment Agency had before it a complete supplemental EIR addressing the potential cumulative impacts of the hypothetical development. There is no comparable failure to consider environmental consequences by chopping up the project.

■■■ 3. *Overriding Considerations: Did the Agency abuse its discretion by justifying demolition with the benefits of redevelopment?*

The Duseks claim the Agency's findings, or lack thereof, are incongruous. On the one hand, the Agency did not consider the cumulative adverse impacts of developing 350,000 square feet of office and retail space

and yet, on the other hand, they claim its corresponding benefits were used to justify the redevelopment. This type of one-sided decisionmaking, according to the Duseks, does not comport with the cost-benefit analysis required by CEQA.

The Agency listed 12 overriding considerations necessitating demolition. These considerations refer to implementation of the adopted redevelopment plan. They reaffirm the commitment to redevelopment of Parcel 10 but are not dependent on development in any particular configuration or at any particular level. Hence, the Agency did not consider the benefits of a project yet to be approved. It simply found, "The action will enable the Agency to market the entire Parcel 10 for redevelopment and increase the chances for obtaining a commitment from a developer with the uncertain status of the Property being removed as an obstacle." Redevelopment, as a preexisting policy, was legitimately considered in the cost-benefit equation.

Moreover, the Duseks have a fundamental misconception. They continue to assert that the Agency has not and cannot identify any positive overriding considerations to justify demolition of a national historic landmark. But CEQA does not compel retention of old buildings in the name of historical preservation. The Agency found that removal of the building, despite its historical significance, fostered its continuing goal of redevelopment. Implementation of the redevelopment plan, even in the absence of a specific development plan, can justify clearance of the Pickwick under CEQA.

■ 4. *"No Project" Alternative: Did the Agency abuse its discretion by approving a part of the project described in the 1983 EIR where the proposed project was not compared to a true "no project" alternative?*

The Duseks have correctly pointed out the deficiency in the 1983 EIR's "no project" alternative. A "no project" alternative must describe maintenance of the existing environment as a basis for comparison of the suggested alternatives to the status quo. "[CEQA] concerns itself with the impacts of the project on the environment, defined as the existing physical conditions in the affected area. The legislation evinces no interest in the effects of [a] proposed . . . plan . . . on an existing . . . plan, but instead has clearly expressed concern with the effects of projects on the actual environment upon which the proposal will operate." (*Environmental Planning & Information Council* v. *County of El Dorado* (1982) 131 Cal.App.3d 350, 354 [182 Cal.Rptr. 317].) Consequently, the "no project" alternative of developing 175,000 square feet, even if such an estimate had actually been approved, is manifestly inadequate under CEQA.

However, the original project was not approved. Consequently, the comparison of 350,000 square feet to the purported "no project" development

of 175,000 square ·feet is irrelevant. The issue is whether there was good faith, reasonable, and substantial compliance with CEQA with respect to the approved project.

Again we look to substance rather than labels. Retention of the Pickwick maintained the existing environment. The EIR included that option in four of the stated alternatives. Although there was not a formalized "no project" alternative, the Agency thoroughly considered that alternative in several contexts. Their actions were reasonable and substantially furthered the objective of assuring consideration of the existing environment. The fundamental analysis made was a comparison between the proposed action, demolition, and the existing environment, retention.

*Conclusion*

The Agency may have committed a minor CEQA sin or two. However, requiring it to engage in the punitive acts of redrafting the EIR, recirculating it for public comment, and rewriting the appropriate comments, considerations, and findings is a fate worse than purgatory. Had the public in any way been misled or defrauded, had the decisionmakers been deprived of any relevant information or comparison, or had the adverse environmental impacts been ignored, misstated, or underestimated, we would not hesitate to impose such a sentence. However, in the spirit of CEQA we will not participate in the waste of more valuable resources; here, time, paper and energy. There is nothing substantive to be gained by curing the technical defects in this EIR. The decisionmakers, fully aware of the environmental cost of demolition, opted to improve the environmental quality of life in the downtown area by removing what they perceived as blight. Those decisions are the prerogatives of politicians, not judges.

The denial of the writ of mandate is affirmed. The Agency is to recover its costs of appeal.

Trotter, P. J., and Sonenshine, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 22, 1986.