Filed 11/14/24 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JOHN M. GOODEN,<br><br>      Plaintiff and Appellant,<br><br>      v.<br><br>THE COUNTY OF LOS ANGELES, et al.,<br><br>      Defendants and Respondents. | B326446<br><br>(Los Angeles County Super. Ct. No. 21STCP01784)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on October 24, 2024, be modified as follows:

---

\*     Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication as to all parts except Part II of the Discussion.

1.  On page 24, in the paragraph beginning "Gooden responds with," in the citation sentence following the sentence beginning "The court in *Save Our Capital!*," add a semi-colon and the following text after the citation to "*Save Our Capital!*, at pp. 675-676" and before the closing parenthetical and period:

    see also *Friends of College of San Mateo Gardens v. San Mateo Community College Dist.* (2017) 11 Cal.App.5th 596, 610-611 [because "aesthetic impact" was critical to project to demolish college campus buildings, report should have addressed removal of small garden; where "aesthetic value" is at issue, "[t]he significance of an environmental impact is not based on its size but is instead "'measured in light of the context where it occurs"'"]

    \*    \*    \*

There is no change in the judgment.

Appellant's petition for rehearing is denied.

_____

LUI, P. J.              CHAVEZ, J.              HOFFSTADT, J.

2

Filed 10/24/24 (unmodified opinion)

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JOHN M. GOODEN, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> THE COUNTY OF LOS ANGELES, et al., <br><br> Defendants and Respondents. | B326446 <br><br> (Los Angeles County Super. Ct. No. 21STCP01784) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kevin Brazile, Judge.  Affirmed.

Robert S. Gerstein for Plaintiff and Appellant.

---

*      Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication as to all parts except Part II of the Discussion.

Office of the County Counsel, Dawyn R. Harrison, County Counsel, Starr Coleman, Assistant County Counsel, Kathy H. Park, Deputy County Counsel; The Sohagi Law Group, Margaret M. Sohagi, R. Tyson Sohagi, and Mark J.G. Desrosiers for Defendants and Respondents.

\* \* \* \* \* \*

Under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.),[1] a public agency must prepare an environmental impact report if any project it is contemplating—which can include amendments to a local government's general plan for land use—"may have a significant effect on the environment." (§§ 21100, subd. (a), 21151, subd. (a); Cal. Code Regs., tit. 14, § 15064, subd. (a)(1).) The primary purpose of this report is informational—that is, "to give the public and government agencies [contemplating the project] the information needed to make informed decisions." (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1162 (*Bay-Delta*).) But what if the public agency, prior to certifying the environmental impact report, ultimately takes action in a manner that deviates from the project described in that report? Does that deviation undermine the informational value of the previously circulated report and, if so, what remedy does CEQA demand? We hold that CEQA contemplates three possible outcomes in this scenario. If the deviation alters the very "nature of the project" and its "main features," the deviation retrospectively renders inaccurate and unstable the definition of the project previously set forth in the report, thereby necessitating a new report to evaluate what is

---

1       All further statutory references are to the Public Resources Code unless otherwise indicated.

2

effectively a new project. If the deviation is less extreme, but increases the project's adverse environmental impact by adding "significant new information" for consideration, the public agency must recirculate for further public comment an amended version of the pertinent portions of the previously circulated report. And if the deviation does not trigger either of these duties, no further action is required.

In this case, a county circulated an amended land use plan for an unincorporated mountainous region that contemplated continued heavy regulation of vineyards in that region, but the county board ultimately imposed a *ban* on new vineyards. We conclude that this deviation did not alter the very nature of the plan amendment or its main features, and that the vintner challenging the county board's action waived any request for recirculation. We accordingly affirm the trial court's denial of the vintner's petition for a writ of administrative mandamus.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

#### A. *The Santa Monica Mountains North Area*

The Santa Monica Mountains North Area is an approximately 21,000-acre area of land in an unincorporated portion of northwestern Los Angeles County in the Santa Monica Mountains—one of the County's "most significant ecological and scenic resources."

The County regulates land use in the North Area pursuant to (1) the North Area Plan, which was first adopted in October 2000 as a part of the County's General Plan and serves as a "planning tool" with "area-specific policies," and (2) the Community Standards District, which was first adopted in

3

October 2002 and serves as a "zoning overlay" within the County Code to implement the policies of the North Area Plan.

**B.** ***Land uses within the North Area, including vineyards***

The North Area enjoys a "long history as a rural setting." Most of the North Area—16,514 acres—constitutes open space, while 4,170 acres are designated for commercial, public, and residential uses. Only around 100 acres are used for agriculture, which predominantly consists of vineyards along Mulholland Highway and Kanan Dume Road, as well as in Triunfo Canyon.

The North Area's southern boundary stops five miles from the coast because the California Coastal Commission regulates the land within five miles of the coastline. In October 2014, the California Coastal Commission certified a Local Coastal Program—which consists of land use plans and zoning ordinances—for the five miles of land adjacent to the North Area.[2] Among other things, the Local Coastal Program prohibited any new vineyards within its boundaries; according to the staff report submitted in support of the ban, this ban was necessary due to the "adverse impacts attributed" to the operation of vineyards, "including increased erosion from removal of all vegetation, use of pesticides, large amounts of water

---

[2] A group of landowners in the area governed by the Local Coastal Program unsuccessfully litigated several challenges to the certification. (See *Mountainlands Conservancy, LLC v. California Coastal Com.* (2020) 47 Cal.App.5th 214.) We reject the County's assertion in its briefing that the trial court should have augmented the record in this case to include a study contained in the record of the litigation regarding the Local Coastal Program. The County did not file a cross-appeal.

4

required, their invasive nature, and their adverse impact to scenic views."

Shortly thereafter, in December 2015, the County's Board of Supervisors (the Board) adopted an ordinance specifically regulating vineyards in the North Area. The 2015 ordinance obligated anyone seeking to open a new vineyard or to expand an existing vineyard to obtain a conditional use permit; it also established development standards for *all* vineyards—existing or new—to address the potential environmental impacts caused by the "proliferation of vineyards" in the North Area.

### C. *The project*

In April 2016, the Board voted to undertake a "comprehensive update" to the North Area Plan and to the Community Standards District. This update implicated CEQA. The Board described the "project" to be undertaken as an update "to provide greater protection of biological habitats, align Plan and [Community Standards District] policies and standards with the [Local Coastal Program], support the rural and semi-rural character of the [North Area], and bring the land use policies for the North Area into compliance with the General Plan." The update would result in a corresponding "replace[ment]" to pertinent zoning provisions in the County Code and a rezoning of hundreds of parcels. In other words, the project did "not include any physical development"—instead, it "identifi[ed] land use policies and development standards" for the North Area.

#### 1. *Draft environmental impact report*

The County issued a draft environmental impact report for the project in May 2020. The draft report identified several key revisions to the North Area Plan and the Community Standards District, including:

5

- Adopting various development standards to protect sensitive biological resources, habitats, and scenic attributes;
- Imposing new permit requirements when protected trees are affected by development;
- Setting standards for equestrian facilities;
- Limiting the use of event facilities;
- Establishing noise levels; and
- Imposing new permit requirements for grading projects.

As for viticulture, the draft proposed reducing the minimum threshold for when the growth of grapes would be considered a "vineyard" subject to the more stringent development standards in the 2015 ordinance; the draft also added standards for integrated pest management. There was no proposed ban on new vineyards.

The County received almost 100 comments to the draft report, with several voicing "support" of a "complete" "ban" on vineyards "in the same fashion as in the Local Coastal Program."

2.     *Final environmental impact report*

The final environmental impact report was issued in September 2020 with some changes. The final report did not propose a vineyard ban; instead, the County responded to the comments urging a ban by explaining that the existing regulations governing "development standards" for vineyards sufficed to "ensure that environmental impacts are minimized."

Following a hearing on October 7, 2020, the County's Department of Regional Planning recommended that, with a few minor modifications, the Board certify the final environment impact report, approve the updates to the North Area Plan and Community Standards District, and adopt an ordinance amending the pertinent provisions of the County Code.

3. *Certification*

The Board convened a public meeting on November 4, 2020 to consider the recommendation. At the conclusion of the meeting, the Board "indicate[d] its intent to certify" the final report, approve the updated plan, and amend the County Code. But the Board made one change pertinent to this appeal:[3] "[P]rohibit new vineyards of any size."

After soliciting and receiving written comments regarding the proposed ban on new vineyards, the Board held another public meeting on May 4, 2021 and voted unanimously to certify the report, approve the updated North Area Plan and Community Standards District, and adopt the ordinance amending the pertinent provisions of the County Code. The vineyard ban is reflected in section 22.336.070, subdivision (Y)(1)(a) of the County Code and states: "All new vineyards, regardless of size, shall be prohibited in this [Community Standards District]."

## II. Procedural Background

The Malibu Coast Vintners and Grape Growers Alliance, Inc. (the Alliance) and one of its members, a vintner named John Gooden (Gooden), filed a petition for a writ of mandate on June 2, 2021. The Alliance and Gooden had submitted comments during the CEQA proceedings opposing a vineyard ban. The writ petition challenged the Board's action banning all new vineyards in the North Area Plan as violating (1) CEQA's requirements that (a) the project have an accurate and stable description and (b) the report be recirculated when significant new information is added; and (2) Government Code section 65857's requirement that the

---

[3] The Board identified a handful of other changes that are not at issue here.

7

Board remand the new ban proposal for consideration by the Department for Regional Planning.[4]

Following a full round of briefing and a hearing, the trial court issued an order on November 14, 2022 denying the writ petition.

Following the entry of judgment for the County and the Board, the Alliance and Gooden appealed. The Alliance abandoned the appeal, leaving only Gooden to pursue it.

## DISCUSSION

Gooden argues that the County (1) violated CEQA by certifying the report and approving the project, and (2) violated Government Code section 65857 by amending the County Code.[5] Because Gooden challenged the County's action with a petition for a writ of administrative mandamus, our task is to assess whether the pertinent agency—here, the County through its Board—has committed a "prejudicial abuse of discretion," which exists when the agency "has not proceeded in the manner required by law" or the agency's "findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b); *Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 935 [applying this standard in writ review of CEQA-based

---

[4] The writ also challenged the Board's action as contrary to the County's general plan, as arbitrary and capricious, and as denying equal protection, but those theories have all been abandoned on appeal.

[5] Gooden argues that the County also violated one of its Code provisions containing the same language as Government Code section 65857, but it appears that the County Code provision Gooden cites is inapplicable to the project at issue in this case. (See L.A. County Code, § 22.232.040, subd. (B)(2)(a).)

8

claim].)  As pertinent here, our task in reviewing the trial court's denial of the writ is to "step into the trial court's shoes" and independently examine for ourselves whether the agency acted properly.  (*Gonzales v. California Victim Compensation Bd.* (2023) 98 Cal.App.5th 427, 441; *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 [applying this standard in writ review of CEQA-based claim].)  We independently review any subsidiary legal questions, including the meaning of statutes.  (*John v. Superior Court* (2016) 63 Cal.4th 91, 95-96; *City of San Diego v. Board of Trustees of California State University* (2015) 61 Cal.4th 945, 956.)  The burden of demonstrating a prejudicial abuse of discretion rests on the party challenging the agency's action.  (*Southwest Regional Council of Carpenters v. City of Los Angeles* (2022) 76 Cal.App.5th 1154, 1172 (*Southwest Regional*).)

## I.    CEQA

Gooden argues that the Board's action in enacting a total ban on new vineyards retroactively renders "unstable" the definition of the "project" set forth in the previously circulated draft and final environmental impact reports.  The County responds that the Board's action *at most* called for recirculation of that portion of the report pertaining to agricultural land use within the North Area, but that Gooden has abandoned on appeal any claim for recirculation.  To evaluate these arguments, we must examine CEQA generally, the CEQA requirement that an environmental impact report set forth an "accurate, stable and finite" project description, and the CEQA threshold for recirculation of environmental impact reports.

9

## A. *The pertinent law*
### 1. *CEQA, generally*

CEQA is designed "'to "[e]nsure the long-term protection of the environment shall be the guiding criterion in public decisions."'" (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 944, quoting *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 74.) CEQA operates, not by dictating pro-environmental outcomes, but rather by mandating that "decision makers and the public" study the likely environmental effects of contemplated government actions and thus make fully informed decisions regarding those actions. (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 447; *Bay-Delta, supra,* 43 Cal.4th at p. 1162; Cal. Code Regs., tit. 14, § 15002, subd. (a)(1); accord, *Vedanta Society of So. California v. California Quartet, Ltd.* (2000) 84 Cal.App.4th 517, 730 ["Projects which significantly affect the environment can go forward, but only after the elected decisionmakers have their noses rubbed in those environmental effects, and vote to go forward anyway," italics omitted].)

The mechanism for that study is the environmental impact report: Where a public agency contemplates a "project"—which includes, among other things, the adoption or amendment of a land use plan (e.g., Cal. Code Regs., tit. 14, § 15378, subd. (a)(1)—and where that project "may have a significant effect on the environment," the agency must prepare an environmental impact report analyzing those effects, and must circulate that report to the public (to obtain comments) and to the agency's decisionmaking body (to ensure its decision is an informed one). (§§ 21100, subd. (a), 21061, 21151, subd. (a); Cal. Code Regs., tit.

14, §§ 15064, subd. (a)(1), 15362; *Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, 725 (*Tiburon*).)

        2.     *CEQA's requirement that the description of the project in the report be "accurate, stable and finite"*

An "indispensable component" of an environmental impact report is an accurate description of the project at issue. (*Western Placer Citizens for an Agricultural & Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 898 (*Western Placer*); *South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 332 (*South of Market*).) Indeed, courts have repeatedly and uniformly characterized "[a]n accurate project description" as "the '*sine qua non*' of an informative and legally sufficient [environmental impact report]." (*Southwest Regional, supra*, 76 Cal.App.5th at p. 1173; *Save Our Capitol! v. Department of General Services* (2023) 87 Cal.App.5th 655, 673 (*Save Our Capitol!*); *The Claremont Canyon Conservancy v. Regents of University of California* (2023) 92 Cal.App.5th 474, 482 (*Claremont Canyon*); *Tiburon, supra*, 78 Cal.App.5th at p. 738; *South of Market*, at p. 332; *stopthemillenniumhollywood.com v. City of Los Angeles* (2019) 39 Cal.App.5th 1, 17 (*stopthemillennium*); *Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1052 (*Treasure Island*); *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 655 (*San Joaquin Raptor*); *Western Placer*, at p. 898; *City of Santee v. County of San Diego* (1989) 214 Cal.App.3d 1438, 1454 (*City of Santee*); *Dusek v. Redevelopment Agency* (1985) 173 Cal.App.3d 1029, 1040 (*Dusek*); *County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 193 (*County of Inyo*).) This characterization makes sense: The whole point of an

11

environmental impact report is to give the public and decisionmakers sufficient information about the impact of the project at issue to make an "intelligent evaluation" of those impacts, so the report must adequately describe what that project is in the first place.  (*Save Our Capitol!*, at p. 673; cf. *County of Inyo*, at p. 192 [a "curtailed or distorted project description may stultify the objectives of the reporting process"].)

Courts have thus uniformly demanded that the description of a project in an environmental impact report be "accurate, stable and finite."  (*Claremont Canyon*, *supra*, 92 Cal.App.5th at p. 482; *Save Our Capitol!*, *supra*, 87 Cal.App.5th at pp. 668, 673; *Southwest Regional*, *supra*, 76 Cal.App.5th at p. 1173; *Buena Vista Water Storage Dist. v. Kern Water Bank Authority* (2022) 76 Cal.App.5th 576, 588 (*Buena Vista*); *stopthemillennium*, *supra*, 39 Cal.App.5th at p. 17; *Tiburon*, *supra*, 78 Cal.App.5th at p. 738; *South of Market*, *supra*, 33 Cal.App.5th at p. 332; *Washoe Meadows Community v. Department of Parks & Recreation* (2017) 17 Cal.App.5th 277, 281 (*Washoe Meadows*); *Treasure Island*, *supra*, 227 Cal.App.4th at p. 1052; *Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 80 (*Communities*); *San Joaquin Raptor*, *supra*, 149 Cal.App.4th at p. 655; *Western Placer*, *supra*, 144 Cal.App.4th at p. 898; *City of Santee*, *supra*, 214 Cal.App.3d at p. 1454; *Dusek*, *supra*, 173 Cal.App.3d at p. 1040; *County of Inyo*, *supra*, 71 Cal.App.3d at p. 193.)  This means that the description must set forth "'the entirety of the project'" (*Tiburon*, at p. 738, quoting *South of Market*, at p. 332; *San Joaquin Raptor*, at p. 654), and, as to that entirety, must describe both the "'nature of the project'" and its "'main features'" (*Tiburon*, at pp. 738-739, quoting *South of Market*, at p. 332 and *Dry Creek Citizens Coalition v. County of*

12

*Tulare* (1999) 70 Cal.App.4th 20, 28 (*Dry Creek Citizens*); *Save Our Capitol!*, at p. 674; *Southwest Regional*, at p. 1173; *Treasure Island*, at pp. 1052, 1055; *Communities*, at p. 84).  The regulations that function as CEQA's so-called "guidelines" specify that a report's project description must accordingly include (1) "[t]he precise location and boundaries of the proposed project" on a map, (2) "[a] statement of the objectives sought by the proposed project," (3) "[a] general description of the project's technical, economic, and environmental characteristics," and (4) "[a] statement briefly describing the intended uses of the [environmental impact report]."  (Cal. Code Regs., tit. 14, § 15124.)  The description need not include *every* detail:  The CEQA guidelines eschew "extensive detail beyond that needed for evaluation and review of the environmental impact" (*ibid.*), and courts have never required the inclusion of information that is not "reasonably feasible" for the agency to obtain and provide (*Southwest Regional*, at p. 1173; *Claremont Canyon*, at p. 483).

By obligating public agencies to prepare and circulate environmental impact reports, to solicit comments, and then to respond to that feedback, CEQA necessarily contemplates that public agencies may opt to alter projects in response to feedback and thus to adopt projects that deviate from what was described in prior environmental impact reports.  If *any* and *every* deviation rendered the description of projects in previously circulated environmental impact reports retroactively inadequate or unstable, public agencies would have a strong disincentive ever to deviate from a project as originally articulated.  This would "freeze" projects "in the precise mold of the initial project" (*County of Inyo, supra*, 71 Cal.App.3d at p. 199; *Save Our Capitol!, supra*, 87 Cal.App.5th at p. 673) and "handcuff

13

decisionmakers" to the project as initially described (*Dusek, supra*, 173 Cal.App.3d at p. 1041; *South of Market, supra*, 33 Cal.App.5th at p. 336).  This is not in the spirit of CEQA, for it would prompt agencies to ignore helpful or enlightening public feedback—a result at odds with the entire purpose of the information exchange triggered by CEQA's environmental impact report procedures.

In threading the needle between ensuring that a project's description is accurate, stable and finite while also not robbing public agencies of the flexibility needed to tailor projects in response to feedback, courts have defined when a public agency's adoption of a project that deviates from the project's description in a prior environmental impact report renders that description inadequate and unstable.  That occurs when deviation is so great that the earlier project description likely "mis[led]" the public and "thwarted the public's ability to participate in the process and comment meaningfully on the [environmental impact report]." (*Save Our Capitol!, supra*, 87 Cal.App.5th at p. 674; *San Joaquin Raptor, supra*, 149 Cal.App.4th at p. 656; see *Washoe Meadows, supra*, 17 Cal.App.5th at p. 290 [deviation means that prior description was an "obstacle" to meaningful public comment].)

Courts have identified three scenarios in which a public agency's project description may be inadequate or unstable:

● *When the environmental impact report does not actually describe the "project" at all.*  When a report sets forth five "dramatically different" potential projects across a "broad range" of possibilities that have "vast[ly]" "different[]" environmental impacts, and does not designate any of them as the project being considered, there is no "adequate" or "stable" project description. (*Washoe Meadow, supra*, 17 Cal.App.5th at pp. 281, 288-290.)

14

However, where a report defines the overall parameters and "footprint" for a specific project such as a mixed-use commercial and residential project, but also includes variants for that project proposing different percentages of the mix between the two uses, the description is stable and the inclusion of those variants does not render the description unstable.  (*Southwest Regional*, *supra*, 76 Cal.App.5th at p. 1179 [so holding]; *South of Market*, *supra*, 33 Cal.App.5th at pp. 332-336 [same].)

● *When the environmental impact report's description of the nature of the project or its main elements is too amorphous.* When a report describes a hotel construction project but omits "any description or detail regarding what [the developer] intended to build" beyond "different conceptual scenarios," the project description is unstable.  (*stopthemillennium*, *supra*, 39 Cal.App.5th at pp. 7-8, 18.)  However, when the project description gives as much detail as can be provided at the time, there is no instability.  Thus, the 20-year, "long-range development plan" at issue in *Treasure Island*, *supra*, 227 Cal.App.4th 1036 was not unstable merely because it did not include details that "[did] not [yet] exist."  (*Id.* at pp. 1052-1055.)  And the project to clear brush in *Claremont Canyon*, *supra*, 92 Cal.App.5th 474, and the project to extract up to a specific quantity of water in *Buena Vista*, *supra*, 76 Cal.App.5th 576, were not unstable merely because the public agencies did not include which trees would be cut down and precisely how much water would be extracted when the descriptions explained how those determinations would later be made.  (*Claremont Canyon*, at pp. 484-490; *Buena Vista*, at p. 590.)  The goal is "adequacy," not "perfection."  (*Claremont Canyon*, at p. 483.)

15

● *When the environmental impact report's description of the nature of the project or its main elements is self-contradictory or inconsistent with later articulations.* When a report gives "conflicting signals" about a project's contours (*Treasure Island*, *supra*, 227 Cal.App.4th at p. 1052), the project description may be unstable and inadequate—if those inconsistencies go to the nature of the project or its main elements. Thus, in *County of Inyo*, *supra*, 71 Cal.App.3d 185, the environmental impact reports inconsistently described the project as drawing water from a lakebed to service the local community *and* as extracting water to service the greater Los Angeles basin as well as installing a pipeline to transport that water; the conflicting project descriptions in those reports were "unstable." (*Id.* at pp. 190, 198-199.) In *Save our Capitol!*, *supra*, 87 Cal.App.5th 655, the environmental impact reports inconsistently described a remodel to the State Capitol Building as involving disparately different exterior design aesthetics; the conflicting project descriptions—at least in the context of a "historical resource" where "aesthetics" is *key*—rendered the project description "unstable." (*Id.* at pp. 675-676.) In *San Joaquin Raptor*, *supra*, 149 Cal.App.4th 645, the draft environmental impact report inconsistently described the project as having "no increases in mine production" and also "provid[ing] for substantial increases in mine production"; the conflicting project descriptions were "unstable." (*Id.* at pp. 654-657.) In *City of Santee*, *supra*, 214 Cal.App.3d 1438, the report and early action by the public agency referred to the temporary expansion of a prison as being indefinite in duration or at most three years, while the public agency ultimately approved a duration of seven years; the conflicting project descriptions regarding the duration of the expansion—which would have a

16

direct bearing on its environmental impact—were unstable. (*Id.* at pp. 1451, 1454-1455.) And in *Communities, supra,* 184 Cal.App.4th 70, the reports regarding new construction at an oil refinery inconsistently described the type of crude oil the refinery would process; the conflicting project descriptions were unstable. (*Id.* at pp. 80-85.) However, where the description of what would be processed at a new oil refinery was consistent in *Rodeo Citizens Assn. v. County of Contra Costa* (2018) 22 Cal.App.5th 214, 220-225, the project description was sufficiently stable.

As these examples illustrate, the instability of a project's description can arise (1) from inadequacies in the environmental impact reports (e.g., *San Joaquin Raptor, supra,* 149 Cal.App.4th at pp. 654-656 [conflicting statements in various reports]), or (2) from subsequent action by the public agency that deviates sufficiently from the project described in the reports that the deviation retroactively renders those reports' description(s) uncertain and hence unstable (e.g., *Southwest Regional, supra,* 76 Cal.App.5th at pp. 1167, 1182; *Save Our Capitol!, supra,* 87 Cal.App.5th at pp. 674-676).

"Whether [an environmental impact report] contains an accurate and stable project description is a question of law subject to de novo review." (*Save Our Capitol!, supra,* 78 Cal.App.5th at p. 673; *Tiburon, supra,* 78 Cal.App.5th at p. 738; *South of Market, supra,* 33 Cal.App.5th at p. 332; *stopthemillennium, supra,* 39 Cal.App.5th at p. 16.) This standard of review dovetails neatly with the standards of review for CEQA review more generally: "An agency's failure to provide an accurate, stable, and finite project description is a failure to proceed in a manner required by law" (*Buena Vista, supra,* 76 Cal.App.5th at p. 588), and appellate courts independently review

17

whether an agency failed to proceed in a manner required by law (*City of Hayward v. Trustees of California State University* (2015) 242 Cal.App.4th 833, 839).

Because, as pertinent here, a project description will be found unstable if a subsequent deviation from the originally articulated description is sufficiently grave to thwart the environmental impact report's ability to serve its communicative function, and because an agency's failure to proceed in a manner required by law is prejudicial "if the failure to include relevant information precludes" "informed public comment" and "informed decisionmaking" (*Southwest Regional*, *supra*, 76 Cal.App.5th at pp. 1172-1183; *Washoe Meadows*, *supra*, 17 Cal.App.5th at p. 290), a finding that a project description is unstable satisfies the requirement for writ relief that the public agency's abuse of discretion be prejudicial.  The writ petitioner need not *also* show that starting over with an accurate project description would lead to a different outcome.  (*stopthemillennium*, *supra*, 39 Cal.App.5th at p. 20.)

3.      *The duty under CEQA to recirculate for further public comment*

As a project moves through CEQA's review process, the public agency necessarily acquires new information and may opt to alter the project in light of that information.  Even if these alterations do not destabilize the project's definition, do they obligate the agency to recirculate the environmental impact report containing the new information for further public comment?  It is well settled that "recirculation is not required simply because new information is added." (*South County Citizens for Smart Growth v. County of Nevada* (2013) 221 Cal.App.4th 316, 328; *Western Placer*, *supra*, 144 Cal.App.4th at

18

p. 899 ["no provision in CEQA . . . requires all changes made to a project . . . be included in the [environmental impact report through recirculation]"]; *Southwest Regional*, *supra*, 76 Cal.App.5th at p. 1184 [same].)  Recirculation is the "exception, rather than the general rule" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1132 (*Laurel Heights*); *East Oakland Stadium Alliance v. City of Oakland* (2023) 89 Cal.App.5th 1226, 1265 (*East Oakland*); *Southwest Regional*, at p. 1184), and for good reason:  If recirculation were required every time new information was considered or incorporated into a project, then the likely result is an endless feedback loop of circulation-new information-recirculation.  CEQA was meant to foster informed consideration of environmental consequences, not total paralysis.  (*Laurel Heights*, at p. 1132 ["the Legislature did not intend to promote endless rounds of revision and recirculation of [environmental impact reports]"].)

CEQA nevertheless recognizes that recirculation is sometimes warranted.  Specifically, CEQA obligates a public agency to recirculate the pertinent portions of an environmental impact report for further public comment when, prior to certification of the report,[6] "significant new information is added to an environmental impact report."  (§ 21092.1; *Chaparral Greens v. City of Chula Vista* (1996) 50 Cal.App.4th 1134, 1146-1147 (*Chaparral Greens*); Cal. Code Regs., tit. 14, § 15088.5, subds. (a), (c).)  For these purposes, "information" is defined

_____

**6** If the public agency has already certified the environmental impact report, whether a new report must be prepared is governed by different provisions of CEQA.  (§ 21166; accord, *Laurel Heights, supra*, 6 Cal.4th at pp. 1125-1126.)

broadly to include "changes in the project or environmental setting as well as additional data or other information." (Cal. Code Regs., tit. 14, § 15088.5, subd. (a).) As a result, new information possibly justifying recirculation can arise from information obtained through public comment or, as pertinent here, the public agency's adoption of a modified version of the project. (E.g., *Southwest Regional*, *supra*, 76 Cal.App.5th at pp. 1181-1182 [entertaining recirculation argument where public agency adopted a modified version of the project].)

Our Supreme Court defined when new information is "significant" for purposes of pre-certification recirculation in *Laurel Heights*, *supra*, 6 Cal.4th 1112. Specifically, the court noted that new information not in a prior environmental impact report is "significant" when that information "discloses: (1) a new substantial environmental impact resulting from the project or from a new mitigation measure proposed to be implemented . . . ; (2) a substantial increase in the severity of an environmental impact unless mitigation measures are adopted that reduce the impact to a level of insignificance . . . ; (3) a feasible project alternative or mitigation measure that clearly would lessen the environmental impacts of the project, but which the project's proponents decline to adopt . . . ; or (4) that the draft [environmental impact report] was so fundamentally and basically inadequate and conclusory in nature that public comment on the draft was in effect meaningless." (*Laurel Heights*, at pp. 1129-1130.) The CEQA guidelines formally adopted the definition articulated by the Supreme Court. (Cal. Code Regs., tit. 14, § 15088.5, subd. (a); *Laurel Heights*, at p. 1130, fn. 15 [language in definition under consideration by administrative agency at time of Supreme Court's decision].)

20

Upon closer inspection, this definition deems new information to be "significant" only if that information (1) is significantly different than what was previously circulated, and (2) tends to show that the project will have a *more adverse* environmental impact than stated or implied in the previously circulated reports. (*Laurel Heights*, *supra*, 6 Cal.4th at pp. 1120, 1129-1130; *East Oakland*, *supra*, 89 Cal.App.5th at p. 1265; Cal. Code Regs., tit. 14, § 15088.5, subd. (a).) Information that "'merely clarifies or amplifies [citation] or makes insignificant modifications'" does not warrant recirculation. (*Laurel Heights*, at p. 1128, quoting *Sutter Sensible Planning, Inc. v. Board of Supervisors* (1981) 122 Cal.App.3d 813, 822-823; Cal. Code Regs., tit. 14, § 15088.5, subd. (b); cf. *Southwest Regional*, *supra*, 76 Cal.App.5th at p. 1185 [information that is "substantially similar" to previously disclosed information does not warrant recirculation].) All of the examples listed in *Laurel Heights* involve the omission of new information tending to indicate a *worse* environmental impact, including the example of an "inadequate and conclusory" draft in *Mountain Lion Coalition v. Fish & Game Com.* (1989) 214 Cal.App.3d 1043, 1051-1053, where the previously circulated report completely omitted any analysis of the cumulative effect of the project on the environment.

Although a public agency's failure to recirculate pertinent portions of an environmental impact report constitutes a failure to proceed in the manner required by law when there is "significant new information" that satisfies the above-stated definition, the threshold determination of whether new information qualifies as "significant" is for the public agency to make in the first instance; courts review the agency's

21

determination in this regard under the deferential substantial evidence standard. (*Laurel Heights*, *supra*, 6 Cal.4th at p. 1135; *Southwest Regional*, *supra*, 76 Cal.App.5th at p. 1184; *Chapparal Greens*, *supra*, 50 Cal.App.4th at p. 1147.)

## B.  *Analysis*

As the pertinent law indicates, a public agency's approval of a project that deviates from how the project was described in previously circulated environmental impact reports can potentially implicate the CEQA rule requiring the project description in the report be "stable" *and* the CEQA rule requiring recirculation of a report. (Accord, *Save Our Capitol!*, *supra*, 87 Cal.App.5th at p. 674 [noting the close relationship between these two doctrines]; *Southwest Regional*, *supra*, 76 Cal.App.5th at pp. 1181-1182 [same].)  Although both CEQA rules are implicated in this scenario, it is critical to determine *which* applies because they call for vastly different remedies:  A public agency's adoption of a modified project that retroactively destabilizes the project's description by itself qualifies as a "prejudicial abuse of discretion" that ostensibly obligates the public agency to start over with the CEQA review process, while the adoption of a modified project does not call for recirculation unless substantial evidence fails to support the agency's implied finding that the modification does not qualify as "significant new information."

Thus, CEQA effectively erects a three-tiered system when it comes to a public agency's adoption of a modified project.  First, the modification can be so fundamentally significant that it calls into question—and hence destabilizes—the description of the project itself, thereby warranting a reboot of the CEQA review process.  Second, the modification can be not so significant as to destabilize the project's description, but significant enough to

22

constitute "significant new information," thereby warranting recirculation for further public comment on the new information. Third and lastly, the modification can be insignificant, in which case no further action need be taken.

Here, because Gooden has abandoned any claim that the Board's action warrants recirculation, the sole question before us is whether the Board's action in approving the project to update the North Area Plan and Community Standards District as amended to include a ban on all new vineyards renders the description of the project set forth in the previously circulated environmental impact reports unstable.

We independently conclude that it does not.

In this case, the project is the revision of the North Area Plan as well as the Community Standards District in their entirety, along with a corresponding overhaul to the County Code provisions governing the North Area. The portion of the North Area Plan and Community Standards District devoted to agricultural land uses is very small: It encompasses one-half of one page of the 91-page Plan and one small subsection of the innumerable-section standards in the Community Standards District. What is more, the *topic* of agricultural land use—and, indeed, the regulation of vineyards—within the North Area Plan was unmistakably part of the "project." In this context, the Board's decision to adopt a total ban on new vineyards in the area rather than to adopt the previously proposed plan to heavily regulate all vineyards does not alter the "'nature of the project'" or any of its "'main features.'" (*Tiburon, supra*, 78 Cal.App.5th at pp. 738-739, quoting *South of Market, supra*, 33 Cal.App.5th at p. 332 and *Dry Creek Citizens, supra*, 70 Cal.App.4th at p. 28; *Save Our Capitol!, supra*, 87 Cal.App.5th at p. 674; *Southwest*

23

*Regional*, *supra*, 76 Cal.App.5th at p. 1173; *Treasure Island*, *supra*, 227 Cal.App.4th at pp. 1052, 1055; *Communities*, *supra*, 184 Cal.App.4th at p. 84.)

The propriety of this result is confirmed when comparing the Board's deviation from the project described in the prior reports in this case to the scenarios where courts have found project descriptions to be unstable. This is not a case where the reports did not describe the project at all. This is not a case where the description of the project was too amorphous. And this is not a case where the prior description of the project is inconsistent with the adopted version *in a manner that alters the nature of the project or its main elements*. To be sure, the treatment of new vineyards under the North Area Plan and Community Standards District *changed*, but, as noted above, this change was but a small part of a much more comprehensive revision of the North Area Plan and Community Standards District as a whole; this change did not alter the nature of *that* project or any of its main elements. To be sure, this change was significant to *potential new vintners*, but if that were sufficient to destabilize a project's description, then any and every deviation from a prior project description would be grounds for hitting the reset button under CEQA; as noted above, that is not the law.

Gooden responds with what boils down to two arguments. First, he points to *Save Our Capitol!*, *supra*, 87 Cal.App.5th 655 as directly on point. It is not. The court in *Save Our Capitol!* took pains to explain that, where the project itself was a remodel to a historical capitol building complex, the change in the aesthetic design of the complex was integral to the status of the complex as a historical resource. (*Save Our Capitol!*, at pp. 675-676.) By contrast, the shift from heavy regulation of new

24

vineyards to an outright ban—when current use for vineyards accounted for less than one percent of the North Area's total acreage—was not integral to the project's updates to the land use policies affecting the entire North Area. Second, Gooden asserts that the shift to a total ban is significant because "most agriculture in the North Area currently consists of vineyards." This may be true, but it does not eclipse the fact that the total amount of acreage dedicated to this use is miniscule or, more to the point, the fact that agricultural land use was a small part of the project of revising the entire North Area Plan.[7]

## II.    Government Code Section 65857

Gooden argues that the Board violated Government Code section 65857 when its adoption of an ordinance banning new vineyards deviated from the recommendation of the Department for Regional Planning without giving the Department an opportunity to provide its input. This statute provides that "any modification of [a] proposed ordinance or amendment by [a] legislative body not previously considered by the planning commission during its hearing[] shall first be referred to the planning commission for report and recommendation." (Gov. Code, § 65857; accord, *id.*, § 65356, subd. (a) [adopting the same rule when a legislative body makes modifications to its general plan].) We will assume that the Board violated Government Code section 65857 when it adopted the vineyard ban without first remanding the matter back to the Department for Regional Planning for its report and recommendation on a ban.

---

[7]     In light of our conclusion, we need not address the County's alternative arguments for affirmance, some of which are impenetrable.

25

We nonetheless must still reject Gooden's argument because he failed to demonstrate that this procedural misstep was prejudicial. Government Code section 65010 requires that the actions of public agencies may not be invalidated "unless the court finds that the error was prejudicial" and "that a different result would have been probable if the error had not occurred." (Gov. Code, § 65010, subd. (b).) The burden of showing a different outcome is probable rests with the party challenging the agency's action. (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 920; *Roberson v. City of Rialto* (2014) 226 Cal.App.4th 1499, 1508.) Here, Gooden offers nothing but speculation that the Board would adopt a different ordinance if the Department of Regional Planning had weighed in on a ban of new vineyards. Indeed, such a different outcome is unlikely because, regardless of any updated recommendation, the Board already had before it public comments favoring and disfavoring a ban, and ultimately decided a ban was in the public interest. Gooden responds that a different outcome is likely because the Department of Regional Planning opted not to recommend a ban in the first instance, but this fact alone cannot be sufficient to constitute prejudice because it is necessarily true in every case where the decisionmaker deviates from a planning commission's prior recommendation; we decline to read the requirement of a prejudice showing mandated by section 65010 out of the Government Code.

## DISPOSITION

The judgment is affirmed. The County and the Board are entitled to costs on appeal.

**CERTIFIED FOR PARTIAL PUBLICATION**.


_____, J.
HOFFSTADT


We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ